# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CAPE FEAR RIVER WATCH
617 Surry Street
Wilmington, NC 28401;

RURAL EMPOWERMENT
ASSOCIATION FOR COMMUNITY
HELP
2389 West Wards Bridge Road
Warsaw, NC 28398;

WATERKEEPERS CHESAPEAKE
P.O. Box 11075
Takoma Park, MD 20913;

WATERKEEPER ALLIANCE
180 Maiden Lane, Suite 603
New York, NY 10038;

HUMANE SOCIETY OF THE UNITED
STATES
1255 23rd Street NW, Suite 450
Washington, DC 20037;

FOOD & WATER WATCH
1616 P Street NW, Suite 300
Washington, DC 20036;

ENVIRONMENT AMERICA
1543 Wazee Street, Suite 410
Denver, CO 80202

COMITE CIVICO DEL VALLE
235 Main Street
Brawley, CA 92227;

CENTER FOR BIOLOGICAL
DIVERSITY
1411 K Street NW, Suite 1300
Washington, DC 20005

Case No. _____

1

ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, CA 94931;

       Plaintiffs,

  v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; and MICHAEL REGAN, in his
official capacity as Administrator of the
U.S. Environmental Protection Agency,

       Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Slaughterhouses and rendering facilities, which together comprise the Meat and Poultry Products ("MPP") industrial point source category, generate significant quantities of water pollution. Every year, these facilities discharge millions of pounds of nitrogen and phosphorus, collectively known as nutrient pollution, along with heavy metals and dozens of other pollutants, into rivers and streams across the United States. According to the U.S. Environmental Protection Agency ("EPA" or "Agency"), MPP facilities are the largest industrial source of phosphorus pollution and the second largest industrial source of nitrogen pollution.

2.     Nutrient pollution has devastating consequences for human health and the environment. According to EPA, nutrient pollution threatens iconic waterways, including the Chesapeake Bay, the Gulf of Mexico, Long Island Sound, and Puget Sound. In addition, EPA has acknowledged that nutrient pollution causes harmful algal blooms, which render water unsafe for drinking, unfit for outdoor recreation, and uninhabitable for aquatic life. For these reasons, EPA has concluded that

nutrient pollution is one of the most widespread, costly, and challenging environmental problems affecting water quality in the United States.

3. Nutrient pollution and other pollution from MPP facilities overwhelmingly harms vulnerable and under-resourced communities. Most MPP facilities are located within one mile of populations that, on average, EPA classifies as low income, linguistically isolated, or at high risk of exposure to toxic substances.

4. Despite these grave consequences, EPA's regulations governing water pollution from the MPP industry are either woefully out-of-date or altogether non-existent. EPA has failed to revise these regulations for *at least* 18 years, notwithstanding its repeated acknowledgment that the existing standards have not kept pace with widely available pollution control technology. Some MPP facilities are still subject to outdated and under-protective standards that EPA promulgated in the mid-1970s, and EPA's existing regulations altogether fail to control discharges of phosphorus, a critical component of nutrient pollution. Moreover, EPA has *never* published national standards applicable to the vast majority of MPP facilities, which discharge wastewater through publicly owned treatment works ("POTWs"), even though EPA has known for decades that—without adequate pretreatment—pollutants in MPP wastewater pass through many POTWs into our nation's rivers and streams.

5. EPA's failure to act and unreasonable delay violate the Clean Water Act ("CWA") and the Administrative Procedure Act ("APA"), respectively. With this action, Plaintiffs Cape Fear River Watch, Rural Empowerment Association for

3

Community Help, Waterkeepers Chesapeake, Animal Legal Defense Fund, Center for Biological Diversity, Comite Civico del Valle, Environment America, Food & Water Watch, The Humane Society of the United States, and Waterkeeper Alliance seek to compel the expeditious promulgation of long overdue regulations governing wastewater discharges from MPP facilities, as the CWA requires.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a), and this Court may grant declaratory relief and further relief pursuant to 28 U.S.C. §§ 2201–2202.

7.     Plaintiffs have a right to bring this action pursuant to the CWA, 33 U.S.C. § 1365(a)(2), and the APA, 5 U.S.C. §§ 701–706.

8.     By certified letter mailed on December 17, 2021, as well as by email, Plaintiffs provided EPA with written notice of the failure to act described in this complaint. Therefore, Plaintiffs are filing this complaint more than 60 days after providing EPA with written notice, as required under 33 U.S.C. § 1365(b).

9.     Venue is proper in the United States District Court for the District of Columbia under 28 U.S.C. § 1391(e), because Defendant U.S. ENVIRONMENTAL PROTECTION AGENCY resides in this district and a substantial part of the events and omissions giving rise to this action occurred here.

## PARTIES

10.     Plaintiff CAPE FEAR RIVER WATCH ("CFRW") is a nonprofit membership organization that aims to protect and improve the water quality of the

Lower Cape Fear River Basin through education, advocacy, and action. The Cape

Fear River Basin is North Carolina's largest river basin. It is home to nearly one-

third of North Carolina's residents, and it supports a broad range of habitats,

including salt marshes, blackwater swamps, and stands of ancient cypress trees.

The Cape Fear River Basin suffers from excessive nitrate and phosphorus

concentrations. In addition, it is the site of the world's largest slaughterhouse,

which discharges an average of nearly 1,760 pounds of nitrogen into impaired

waters each day. Together with its more than 1,000 members, many of whom live

near and recreate in and around the Cape Fear River, CFRW works to ensure that

slaughterhouses, rendering facilities, and other sources of industrial pollution

comply with appropriate permit conditions. CFRW brings this action on behalf of its

members, to ensure that the Cape Fear River exists as a clean, healthy, and

beautiful resource for the next generation.

11.     Plaintiff RURAL EMPOWERMENT ASSOCIATION FOR

COMMUNITY HELP ("REACH") is a nonprofit organization that works to address

social, economic, and environmental inequities in and around Duplin County, North

Carolina. Founded in 2002, REACH aims to educate and empower community

members, including by promoting research and citizen science, as well as by

working to enforce and improve laws and policies that affect the lives of Duplin

County's rural and low-income African-American residents. In partnership with its

approximately 20 members and more than 60 supporters, REACH focuses much of

its community outreach and organizing activities on combatting pollution from

industrial animal agriculture, including slaughterhouses and rendering facilities. REACH brings this action on behalf of its members, including individuals who live near waters affected by pollution from slaughterhouses and rendering facilities.

12. Plaintiff WATERKEEPERS CHESAPEAKE is a coalition of nineteen independent programs working to make the waters of the Chesapeake and Coastal Bays swimmable and fishable. Waterkeepers Chesapeake amplifies the voice of each member program and mobilizes each program to fight pollution and champion clean water. Waterkeepers Chesapeake's member programs work locally, using grassroots action and advocacy to protect their waters and communities, and regionally, sharing resources and leveraging one another's strengths to expand each program's capacity for citizen-based enforcement of strong protections against pollution. Waterkeepers Chesapeake brings this action on behalf of its members, including individuals who live near and recreate in and around waters affected by pollution from slaughterhouses and rendering facilities.

13. Plaintiff WATERKEEPER ALLIANCE ("Waterkeeper") is a nonprofit organization that fights for every community's right to drinkable, fishable, and swimmable water. Waterkeeper is the world's largest and fastest-growing nonprofit organization focused on clean water, uniting over 15,000 individual members, as well as 150 member organizations and 15 affiliate organizations, which collectively represent tens of thousands of additional members and supporters. Through its Clean Water Defense campaign, Waterkeeper fights ever-growing threats to clean water by working to defend, strengthen, and enforce clean water laws, standards,

and permits. In addition, Waterkeeper's Pure Farms, Pure Waters campaign focuses on reforming the destructive and polluting practices of industrialized meat production, ensuring compliance with environmental laws, and supporting independent, traditional family farmers. Waterkeeper brings this action on behalf of its members, including individuals who live near and recreate in and around waters affected by pollution from slaughterhouses and rendering facilities.

14. Plaintiff HUMANE SOCIETY OF THE UNITED STATES ("HSUS") is a nonprofit organization that promotes the protection of all animals. On behalf of its millions of members and constituents, HSUS responds to major instances of animal cruelty, providing hands-on care to abused animals; encourages and empowers people to create a more humane society for animals; partners with companies to reform and improve their treatment of animals; and fights to improve legal protections for animals and animal habitats through the courts and the ballot box. HSUS recognizes that wastewater from industrial facilities, including slaughterhouses and rendering facilities, degrades habitat and puts communities at risk. Accordingly, HSUS brings this action on behalf of its members and constituents, including individuals directly and indirectly affected by waste from slaughterhouses and rendering facilities.

15. Plaintiff FOOD AND WATER WATCH ("FWW") is a nonprofit organization that works to create a healthy future for all people and generations to come. Among other activities, FWW fights to create a just and equitable food system that supports family farmers and rural communities while protecting our air, water,

7

and climate. FWW brings this action on behalf of its more than 180,000 dues-paying members, many of whom live near and enjoy recreating in and around waters affected by pollution from slaughterhouses and rendering facilities.

16.     Plaintiff ENVIRONMENT AMERICA is a nonprofit organization that works to protect America's natural wonders, from beloved national parks like Acadia and Mount Rainier to stunning waterways like the Chesapeake Bay and the Great Lakes, and to promote core environmental values, such as clean air to breathe, clean water to drink, and clean energy to power our lives. Together with its 30 state affiliates, Environment American has over 125,000 individual members in all 50 states, who support its efforts to raise awareness of environmental issues and promote sensible solutions. Environment America's Clean Water Network focuses specifically on connecting and supporting individuals and organizations working to clean up rivers, lakes, and streams across the country—in part, by advocating for meaningful limits on pollution from industrial sources. Environment America brings this action on behalf of its members, many of whom live near and enjoy recreating in and around waters affected by pollution from slaughterhouses and rendering facilities.

17.     Plaintiff COMITE CIVICO DEL VALLE ("CCV") is a nonprofit organization based in California's Imperial Valley that seeks to improve the lives of people in disadvantaged communities, including by working with the members of its Board of Directors, its supporters, and the community at large on public health and environmental justice issues. CCV's constituents have long expressed concerns

about exposures and health outcomes related to pollution from nearby sources, including an MPP facility. Given these concerns, in 2021, CCV commenced a multi-year project to record oral histories of community members' exposure to pollution from the MPP facility and other sources, perform environmental monitoring, and report its findings to the community and government agencies. CCV brings this action on behalf of its members and supporters, in connection with its efforts to empower community members to protect their own health.

18.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a nonprofit organization with over 1.7 million members and online activists dedicated to the preservation, protection, and restoration of public health, biodiversity, and ecosystems. The Center works through science, law, and policy to secure a future for all species, great and small, hovering on the brink of extinction. In particular, the Center often advocates to improve habitats for water-dependent species—in part, by seeking to strengthen and enforce permits issued to industrial facilities under the CWA. The Center brings this action on behalf of its members, many of whom live near or enjoy exploring and recreating in and around waters affected by pollution from slaughterhouses and rendering facilities.

19.    Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a nonprofit organization that works to protect the lives and advance the interests of animals. Among other activities, ALDF challenges industrial agricultural practices that harm animals, the environment, and public health. ADLF also works to secure and enforce legal protections for wildlife, including animals that use land and water

near slaughterhouses and rendering facilities. ALDF brings this action on behalf of its more than 350,000 members and supporters nationwide, many of whom enjoy visiting areas and viewing or attempting to view wildlife in areas affected by water pollution from slaughterhouses and rendering facilities.

20.     Defendant EPA is an agency of the federal government. Congress charged EPA with restoring and maintaining the chemical, physical, and biological integrity of our nation's waters—in part, by complying with statutory mandates concerning the publication, review, and revision of water pollution control regulations for industrial polluters, including MPP facilities.

21.     Defendant MICHAEL REGAN is the Administrator of EPA and, as such, the federal official ultimately responsible for EPA's administration and implementation of its legal duties. He is sued in his official capacity only.

## FACTUAL BACKGROUND

22.     The MPP industry consists of approximately 7,000 facilities that fall into three general categories: (1) meat slaughtering and processing, (2) poultry slaughtering and processing, and (3) rendering.

**Meat Slaughterhouses**

23.     According to the U.S. Department of Agriculture ("USDA"), every year, meat slaughterhouses in the United States process approximately 100 million pigs and 33 million beef cattle, along with millions of sheep, lambs, calves, horses, goats, and exotic livestock such as elk, deer, and buffalo.

24.     Meat slaughterhouses process animals in multiple stages. *First*, slaughterhouse workers receive live animals; contain them in holding cells; and stun, slaughter, and bleed them. *Second*, workers strip animal carcasses of hides and hair, wash them with water, remove their internal organs, and wash them again with water and bactericides. *Third*, workers chill the carcasses, cut them into smaller segments for sale, or further process them into products such as sausages and bacon.

25.     Each slaughtering shift, which usually lasts eight to 10 hours and requires near-constant water use, is generally followed by a six- to eight-hour cleanup shift, which requires significantly more water, along with disinfectants and sanitizing agents.

26.     Slaughterhouses that process pigs and cattle generate between 291 and 532 gallons of wastewater per 1,000 animals killed. The largest meat slaughterhouses discharge up to 5.3 million gallons of wastewater each day.

**Poultry Slaughterhouses**

27.     USDA estimates that a total of 9 billion chickens are killed each year at poultry slaughterhouses in the United States, along with millions of turkeys, small game animals such as quails and pheasants, and exotic birds such as ostriches.

28.     Like meat slaughterhouses, poultry slaughterhouses perform multiple stages of operations, including unloading and confinement; stunning, killing, and bleeding; scalding, defeathering, washing, eviscerating, and re-washing; and

11

chilling, freezing, and packaging. Poultry slaughterhouses also alternate between slaughtering shifts and cleaning shifts, both of which require large volumes of water.

29.     According to EPA, poultry slaughterhouses generate between 580 and 2,440 gallons of wastewater per 1,000 pounds of birds processed. In total, poultry slaughterhouses generate tens of billions of gallons of wastewater each year.

**Rendering Facilities**

30.     Rendering facilities convert slaughterhouse byproducts—including viscera, meat scraps, fat, bone, blood, feathers, and dead animals not suitable for human consumption—into marketable products such as grease, oil, tallow, lard, and animal meal.

31.     Generally, rendering facility workers cook byproducts to recover fats, oil, and grease. The residue is then dried and granulated or ground into meal.

32.     Condensed cooking vapors make up the largest percentage of total rendering wastewater in terms of volume and pollutant load. Other sources of wastewater at rendering facilities include liquid drained from raw material receiving areas, water used for general cleaning and sanitizing, and water used to clean up spills.

33.     EPA reports that an average rendering plant discharges 169 gallons of wastewater per minute, totaling about 243,300 gallons of wastewater per day.

**MPP Facilities' Wastewater Pollution**

34.     Of the approximately 7,000 MPP facilities in the United States, EPA has estimated that at least 4,711 facilities discharge wastewater. (Facilities that do not "discharge" wastewater might contract with a hauling company for wastewater removal, for example, or dispose of wastewater through land application—a practice that remains largely unregulated.) About five percent of discharging MPP facilities—that is, approximately 300 facilities by EPA's estimate—discharge wastewater directly to surface waters. The remaining 95 percent of discharging MPP facilities discharge wastewater indirectly through POTWs.

35.     Wastewater from MPP facilities typically contains nitrogen compounds and phosphorus, as well as blood, fat, oil and grease, fecal bacteria, disease-causing pathogens, detergents, and heavy metals. Nitrogen compounds and phosphorus are prevalent in MPP facility wastewater because they are present in cleaning solutions, urine and feces, and animal parts including blood, fat, and viscera.

36.     According to EPA, direct-discharging MPP facilities generate approximately 16.5 million pounds of nitrogen and 2.84 million pounds of phosphorus every year. As a result, EPA has acknowledged that direct-discharging MPP facilities are the largest industrial source of phosphorus pollution and the second largest industrial source of nitrogen pollution.

37.     Since at least 1977, EPA has recognized that pollutants in MPP facility wastewater, including nitrogen compounds and phosphorus, are not susceptible to treatment by POTWs. Accordingly, EPA has long warned that indirect-discharging

MPP facilities should avoid discharging wastewater to POTWs without prior treatment. *See* EPA, EPA-430/9-76-017a, *Federal Guidelines: State and Local Pretreatment Programs* 8-28-1–8-28-11 (1977). Despite this warning, EPA has never promulgated pretreatment standards for indirect-discharging MPP facilities.

**Harm to Human Health and the Environment**

38.     Nutrient pollution poses serious threats to human health. For instance, exposure to nitrogen compounds in drinking water can cause colorectal cancer, thyroid disease, birth defects, and—in infants under six months of age—methemoglobinemia, or "blue baby syndrome," a potentially fatal condition.

39.     Concerns about the health consequences of exposure to nutrient pollution and other pollution from MPP facilities has fundamentally changed the manner in which Plaintiffs' members and supporters interact with the water.[1] For instance, a member of the Center for Biological Diversity explains that she is "no longer able to enjoy" the Raccoon River in Iowa as she once did, because the river is "visibly polluted downstream" from the point at which it receives wastewater from a

---

[1] For this and other reasons, Plaintiffs have standing to bring this challenge. *See* Decl. of Kemp Burdette (sworn to on August 9, 2022), attached as Ex. 1; *see also* Decl. of Devon Hall (sworn to on September 29, 2022), attached as Ex. 2; Decl. of Robin Broder (sworn to on December 22, 2022), attached as Ex. 3; Decl. of Ted Evgeniadis (sworn to on December 21, 2022), attached as Ex. 4; Decl. of Daniel E. Estrin (sworn to on August 4, 2022), attached as Ex. 5; Decl. of Nelson Brooke (sworn to on August 5, 2022), attached as Ex. 6; Decl. of Chris Holbein (sworn to on December 21, 2022), attached as Ex. 7; Decl. of Nancy Thompson (sworn to on December 21, 2022), attached as Ex. 8; Decl. of Wenonah Hauter (sworn to on July 28, 2022), attached as Ex. 9; Decl. of Jackie Eubank (sworn to on August 5, 2022), attached as Ex. 10; Decl. of John Rumpler (sworn to on August 1, 2022), attached as Ex. 11; Decl. of Robert Knight (sworn to on September 1, 2022), attached as Ex. 12; Decl. of Luis Olmedo (sworn to on December 21, 2022), attached as Ex. 13; Decl. of Lori Ann Burd (sworn to on August 1, 2022), attached as Ex. 14; Decl. of Danielle Wirth (sworn to on August 26, 2022), attached as Ex. 15; Decl. of Kendra Melrose (sworn to on July 31, 2022), attached as Ex. 16; Decl. of Sara Parker (sworn to on August 9, 2022), attached as Ex. 17.

slaughterhouse, "and it gives off a putrid odor." Wirth Decl. ¶ 10. The member explains that she is "afraid that exposure to MPP facility pollution could threaten [her] health, [her] husband's health, and the health of [her] pets." *Id*.

40.     According to the Black Warrior Riverkeeper, who represents an organizational member of Waterkeeper Alliance, he and many of his organization's members avoid swimming and engaging in other activities in Graves Creek, which receives wastewater from a slaughterhouse in Blountsville, Alabama, for fear of exposure to dangerous levels of bacteria and other pollution. One member "stopped kayaking . . . because he got sick after paddling" downstream of the slaughterhouse. Brooke Decl. ¶ 12.

41.     In rural North Carolina, the Co-Founder and Executive Director of REACH, along with many REACH members, "ha[s] given up drinking tap water" due to concerns that well water and municipal water both are "contaminated with pollution from MPP facilities and other industrial animal agriculture facilities." Hall Decl. ¶ 12. In addition, he "stopped fishing after [he] began to catch fish with open sores," which, he believes, are caused by bacteria and other pollution. *Id*. ¶ 11.

42.     The Executive Director of Comite Civico del Valle "[does] not think that it is safe to swim" in the New River in Imperial County, California, which receives wastewater from a slaughterhouse. Olmedo Decl. ¶ 11. As he explains, due to water pollution in the New River, "it certainly is not very pleasant to spend time nearby." *Id*.

43.     In addition to threatening human health, nutrient pollution and other pollution from slaughterhouses can have devastating effects on the environment. For example, in the Cape River Water Basin, "visible" and "distressing" pollution consisting of "solids[] and foamy residue," likely "a mixture of fat and chemical disinfectants," "persists miles downstream" from a discharging slaughterhouse, "threaten[ing] people and wildlife" who live nearby. Burdette Decl. ¶ 9.

44.     Fat and other solid pollutants in MPP wastewater can harm wildlife directly—for instance, by clogging fish gills, potentially resulting in asphyxiation—and indirectly, by creating anaerobic conditions during decomposition and thereby degrading habitat for fish, shellfish, and other aquatic species.

45.     In addition, EPA recognizes that nutrient pollution, such as that discharged by MPP facilities, causes harmful algal blooms.

46.     On the Shenandoah River, MPP facility water pollution feeds algal blooms that "give off a terrible smell" and are "so thick that it is impossible to paddle a kayak, let alone fish." Broder Decl. ¶ 5.

**Environmental Justice**

47.     Water pollution from MPP facilities raises significant environmental justice concerns.

48.     EPA has concluded that "74 [percent] of MPP facilities that directly discharge wastewater to surface waters are within one mile of census block groups with demographic or environmental characteristics of concern." *See* EPA, EPA-821-

R-21-003, *Preliminary Effluent Guidelines Program Plan 15*, at 6-2 (2021)

[hereinafter "Preliminary Plan 15"].

49.     A recent analysis of 184 direct-discharging MPP facilities confirmed

that many are located near vulnerable and under-resourced communities. *See*

*Comments of the Env't Integrity Project and Earthjustice et al.,* at 9–14, Docket ID

No. EPA-HQ-OW-2021-0547, Comment ID EPA-HQ-OW-2021-0547-0462 (Oct. 14,

2021) [hereinafter "EIP Preliminary Plan 15 Comments"]. In particular, MPP

facilities are disproportionately likely to be located within one mile of communities

that EPA classifies as "low-income," meaning that the household income is less than

or equal to twice the federal poverty level; "linguistically isolated," meaning that no

household member over the age of 14 speaks English "very well" or as their only

language; or at heightened risk from toxic discharges in wastewater. *Id.*

## LEGAL FRAMEWORK

50.     Congress passed the CWA "to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The

CWA protects all waters of the United States, including rivers, streams, and other

surface waters that supply drinking water, support fish and wildlife, and provide

aesthetic value and recreational opportunities.

51.     The CWA sets a national goal of eliminating water pollution. *Id.*

§ 1251(a)(1). To achieve this goal, the CWA requires EPA to promulgate national,

industry-specific pollution control standards at different levels of stringency for

conventional, toxic, and non-conventional pollutants and to revise these standards as appropriate to keep pace with advances in technology. *Id.* §§ 1314(b), 1317(b).

52.    Conventional pollutants include biochemical oxygen demand, suspended solids, fecal coliform, and pH. *Id.* § 1314(a)(4). Toxic pollutants include a variety of heavy metals and other dangerous compounds. *See* 40 C.F.R. § 401.15. Nitrogen compounds and phosphorus are classified as non-conventional pollutants.

53.    For facilities that discharge directly into surface waters, EPA must promulgate control standards in the form of effluent limitation guidelines ("ELGs"), which then form the basis of the effluent limitations included in individual wastewater discharge permits. *See* 33 U.S.C. § 1314(b). For facilities that discharge indirectly through POTWs, EPA must publish pretreatment standards. *Id.* § 1317(b).

**Effluent Limitation Guidelines**

54.    EPA must establish effluent limitations for toxic and non-conventional pollutants such as nitrogen compounds and phosphorus based on the best available technology economically achievable ("BAT"). *Id.* §§ 1311(b)(2), 1314(b)(2)(B). The CWA requires EPA to review and, if appropriate, revise effluent limitations at least every five years. *Id.* § 1311(d).

55.    To facilitate the adoption and revision of effluent limitations, the CWA mandates that EPA develop and publish ELGs that characterize the wastewater discharges from a given industry, identify the level of pollution control that is

achievable in light of available technologies, and specify the relevant factors for determining what constitutes BAT. *Id.* § 1314(b).

56.     BAT represents the gold standard for controlling water pollution from existing sources. Accordingly, BAT must reflect, at a minimum, the performance of the single best-performing plant in an industrial field.

57.     To ensure that ELGs keep pace with advances in control technology, the CWA directs EPA to "publish . . . regulations, providing guidelines for effluent limitations, and, *at least annually* thereafter, revise, if appropriate, such regulations." *Id.* (emphasis added).

58.     Therefore, the CWA imposes on EPA a mandatory annual duty with respect to ELGs. Every year, EPA must either (1) make a determination that revision is not appropriate, or (2) make a determination that revision is appropriate and issue revised ELGs within the statutory deadline.

59.     For decades, EPA has addressed its independent obligations regarding effluent limitations and ELGs simultaneously by promulgating ELGs that include effluent limitations. *See, e.g.*, Notice of Final 2008 Effluent Guidelines Program Plan, 73 Fed. Reg. 53,218-03, 53,221 (Sept. 15, 2008) (stating that "as part of its annual review of effluent limitations guidelines under section 304(b), EPA is also reviewing the effluent limitations they contain, thereby fulfilling its obligations under sections 301(d) and 304(b) simultaneously").

60.     Although EPA may elect to complete its quinquennial obligation to review and revise effluent limitations *more frequently* than the CWA requires, the

Agency has no authority to ignore or extend its annual obligation with respect to ELGs. Indeed, as EPA has recognized, compliance with this annual obligation is essential "[t]o ensure that effluent [limitation] guidelines remain current with the state of the industry and with available control technologies." Effluent Guidelines Plan, 63 Fed. Reg. 29,203, 29,204 (May 28, 1998).

**Pretreatment Standards**

61.     In drafting the CWA, "Congress recognized that regulating only those sources that discharge effluents directly into the Nation's waters would not be sufficient to achieve the CWA's goals." Effluent Limitations Guidelines and New Source Performance Standards for the Meat and Poultry Products Point Source Category, 69 Fed. Reg. 54,476, 54,479 (Sept. 8, 2004). Accordingly, to control water pollution originating from indirect-discharging facilities, Congress directed EPA to establish pretreatment standards—that is, technology-based regulations that govern the introduction into POTWs of "pollutants which are determined not to be susceptible to treatment by [POTWs] or which would interfere with the operation of [POTWs]." 33 U.S.C. § 1317(b)(1).

62.     Pretreatment standards may take the form of maximum one-day and monthly average concentrations for specific pollutants discharged to POTWs. *See, e.g.*, 40 C.F.R. § 418.76 (establishing pretreatment standards for ammonia and phosphorus applicable to certain industrial sources).

63.     The CWA directs EPA to promulgate pretreatment standards by July 15, 1973. *See* 33 U.S.C. § 1317(b)(2). In addition, the CWA mandates that EPA

20

"shall, from time to time, as control technology, processes, operating methods, or other alternatives change, revise [pretreatment] standards[.]" *Id.*

64.     EPA has recognized that, in developing pretreatment standards for existing sources of non-conventional pollutants, the Agency must "consider[] the same factors . . . as it does for BAT limitations." Preliminary Plan 15 at 2-3.

65.     EPA promulgates both pretreatment standards for existing sources ("PSES"), which apply to all sources that began construction *before* the publication of proposed standards, and pretreatment standards for new sources ("PSNS"), which apply to sources that began construction *after* the publication of proposed standards or on a date specifically provided for by regulation. Upon publication, pretreatment standards apply to individual facilities through operating permits issued under the National Pretreatment Program. *See* 40 C.F.R. § 403.

## REGULATORY HISTORY

66.     EPA has promulgated or revised ELGs for direct-discharging MPP facilities only three times: in 1974, 1975, and 2004.

67.     Although EPA has repeatedly recognized that its existing regulations do not provide the statutorily mandated level of protection, it has not issued or revised any MPP industry ELGs since 2004.

68.     Notwithstanding EPA's mandatory *annual* duty to complete review and, if appropriate, revision of MPP industry ELGs, the Agency has not announced the outcome of an annual review in a final agency document since May 2, 2018.

69.     Since announcing its May 2, 2018 decision *not* to revise MPP industry ELGs, EPA has repeatedly indicated that existing water pollution control standards governing the MPP industry are insufficient.

70.     EPA has never promulgated pretreatment standards for indirect-discharging MPP facilities.

**MPP Industry ELGs**

71.     EPA first promulgated ELGs for various meat slaughterhouses and rendering facilities in 1974 and 1975. *See* Meat Products Point Source Category, 39 Fed. Reg. 7,894 (Feb. 28, 1974) (codified at 40 C.F.R. pt. 432); *see also* Meat Products and Rendering Processing Point Source Category, 40 Fed. Reg. 902 (Jan. 3, 1975) (codified at 40 C.F.R. pt. 432). These regulations set ELGs for several pollutants, including 5-day biochemical oxygen demand ("BOD5"), total suspended solids ("TSS"), pH, oil and grease, fecal coliforms, and ammonia, a nitrogen compound. *See* 39 Fed. Reg. at 7,898; *see also* 40 Fed. Reg. at 905.

72.     In 1975, EPA proposed, but never finalized, ELGs for poultry slaughterhouses and rendering facilities. *See* EPA, EPA-821-R-04-011, *Technical Development Document for the Final Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category (40 C.F.R. 432)*, at 2-15 (2004) [hereinafter "2004 Technical Development Document"].

73.     In 2004, EPA revised ELGs for "non-small" meat slaughterhouses and rendering facilities and promulgated new ELGs for "non-small" poultry facilities. 69

Fed. Reg. at 54,476; *see* 2004 Technical Development Document.[2] For some facilities, these regulations set limits for ammonia and total nitrogen discharges; for others, they limited the discharge of conventional pollutants, including BOD5, TSS, pH, oil and grease, and fecal coliforms. *See* 69 Fed. Reg. at 54,488 (summarizing regulatory changes by subcategory and size in Table VI.H-1).

74.     At the time, EPA estimated that the updated rules for "non-small" meat and poultry facilities would impact only 246 direct-discharging facilities, leaving the overwhelming "majority of facilities in the meat and poultry products industry" unaffected. Effluent Limitations Guidelines and New Source Performance Standards for the Meat and Poultry Products Point Source Category, 67 Fed. Reg. 8,582, 8,590, 8,612 (Feb. 25, 2002).

**EPA's Recognition that MPP Industry Standards May Be Inadequate**

75.     For more than a decade, EPA has recognized that revisions to the MPP industry ELGs may be appropriate.

76.     In 2011, EPA identified the MPP industry for further review because of the industry's relatively high ranking in terms of "toxic-weighted pound equivalent" ("TWPE"), a calculation that enables the Agency to rank the relative toxicities of different pollutant discharges. *See* EPA, EPA-821-R-12-001, *2011 Annual Effluent*

---

[2] EPA defines "non-small" meat slaughterhouses and rendering facilities as facilities that slaughter more than 50 million pounds of animals each year, produce more than 50 million pounds of finished product each year, or render 10 million pounds or more of raw material each year. 69 Fed. Reg. at 54,488; *see* 40 C.F.R. §§ 432.10–432.107. "Non-small" poultry facilities either slaughter more than 100 million pounds per year in live weight killed or further process more than 7 million pounds of finished product per year. 69 Fed. Reg. at 54,484–85; *see* 40 C.F.R. §§ 432.110–432.127.

*Guidelines Review Report*, at 11-1 (2012). The total TWPE of the MPP industry was higher than that of the coal mining, centralized waste treatment, pesticide chemicals, and aluminum forming point source categories. *Id*. at 1-2, tbl.1-1.

77.     In 2015, EPA identified the MPP industry "for preliminary review because it rank[ed] high again, in terms of [TWPE]." EPA, EPA-821-R-16-002, *2015 Annual Effluent Guidelines Review Report*, at 3-5 (2016).

78.     Despite identifying the MPP industry for preliminary review, in 2016, EPA declined to undertake further review of the MPP industry. Instead, EPA stated that it "may do so in the future . . . as additional data become available." EPA, EPA-821-R-16-001, *Preliminary 2016 Effluent Guidelines Program Plan*, at 4-7 (2016); *see* Preliminary 2016 Effluent Guidelines Program Plan, 81 Fed. Reg. 41,535 (June 27, 2016).

79.     On May 2, 2018, EPA finalized its conclusion not to revise MPP industry ELGs. *See* EPA, EPA-821-R-18-001, *Final 2016 Effluent Guidelines Program Plan* 8-1–8-2 (2018*); see also* Final 2016 Effluent Guidelines Program Plan, 83 Fed. Reg. 19,281-02 (May 2, 2018) (stating that "EPA concluded that no additional industries warrant new or revised [ELGs] at this time" in the MPP industry). EPA did not present any new analysis to support or explain this conclusion.

80.     Since May 2, 2018, EPA has neither announced in a final agency document any decision with respect to revising MPP industry ELGs nor revised those ELGs. Thus, May 2, 2018 marks the last time that EPA completed its

mandatory annual duty to review, and if necessary, revise ELGs. *See* 33 U.S.C.

§ 1314(b) (providing that EPA "shall" review and, if appropriate, revise ELGs "at

least annually").

**EPA's Findings Since it Last Completed its Mandatory Review-and-Revise Duty**

81.    In 2019, EPA did not make any decision with respect to revising the

ELGs for the MPP industry, nor did it revise those ELGs. Instead, EPA announced

that it "intend[ed] to continue the review or study of" the MPP industry, based on

its findings that MPP facilities are a leading industrial source of nitrogen water

pollution. EPA, EPA-821-R-19-005, *Preliminary Effluent Guidelines Program Plan*

*14*, at 8-1 (2019) [hereinafter "Preliminary Plan 14"]. EPA also found that half of

the MPP industry surveyed in a national sample discharged an annual average

total nitrogen concentration "well below the ELG monthly average," strongly

suggesting that existing ELGs are out of date. *See id.*, at 3-14.

82.    In January 2021, EPA "announc[ed] that the Agency will conduct a

detailed study of the [MPP] category" in order to "continue the review or study of"

MPP industry ELGs. EPA, *Effluent Guidelines Program Plan 14* 6-4, 8-1 (2021); *see*

Effluent Guidelines Program Plan 14; Notice of Availability, 86 Fed. Reg. 1960-02

(Jan. 11, 2021).

83.    In September 2021, EPA published a preliminary determination that

revision of MPP industry ELGs is appropriate. *See* Preliminary Plan 15 at 6-2; *see*

*also* Preliminary Effluent Guidelines Program Plan 15, 86 Fed. Reg. 51,155-01,

51,156 (Sept. 14, 2021). However, EPA did not commit to revising MPP facility ELGs, publish proposed revisions, or specify a timeline for the revision process.

84.     In November 2021, EPA announced its intention to collect additional information about the MPP industry, "to determine if the current regulations remain appropriate." Proposed Information Collection Request; Comment Request; Meat and Poultry Products Industry Data Collection, 86 Fed. Reg. 64,931, 64,931 (Nov. 19, 2021). In connection with this announcement, EPA again acknowledged "that there are existing, affordable technologies that can reduce nutrient concentrations in MPP wastewater," *id.*, but once again, EPA failed to commit to revising MPP facility ELGs, publish proposed revisions, or specify a timeline for the revision process.

*\*\*\**

85.     Currently, "small" meat slaughterhouses and rendering facilities remain subject to ELGs promulgated over 47 years ago, in 1974 and 1975.

86.     "Small" poultry slaughterhouses and rendering facilities are not subject to any ELGs at all, meaning that the discharge of pollutants from these facilities is not nationally regulated. 69 Fed. Reg. 54,476.

87.     Even though EPA has acknowledged that direct-discharging MPP facilities are the largest industrial source of phosphorus pollution, EPA's existing ELGs for the MPP industry do not impose *any* limits on phosphorus discharges.

88.     EPA has *never* promulgated pretreatment standards for MPP facilities that discharge to POTWs, which comprise approximately 95 percent of the industry.

## EPA MUST REVISE ELGs AND PUBLISH PRETREATMENT STANDARDS FOR THE MPP INDUSTRY

89.     Given EPA's longstanding recognition that its existing regulations do not adequately control water pollution from MPP facilities, as the CWA requires, the Agency must revise ELGs and publish pretreatment standards for the MPP industrial point source category. EPA already has access to relevant data and information about modern, affordable water pollution control technologies.

**Effluent Limitation Guidelines**

90.     EPA's own data and conclusions leave no doubt that the existing ELGs for MPP facilities lag far behind the standard imposed by the CWA, which requires EPA to base ELGs for non-conventional pollutants on the performance of the single best-performing plant in an industrial field.

91.     For years, EPA has repeatedly acknowledged that many MPP facilities discharge pollutants at levels *well below* those allowed under EPA's existing ELGs.

92.     Indeed, data included in Discharge Monitoring Reports ("DMR") prepared by MPP facilities from 2016 through 2018 demonstrate that the best-performing *quartile* of meat slaughterhouses and rendering facilities discharges total nitrogen at levels *over 74 times lower* than the currently applicable ELG allows. *See* EIP Preliminary Plan 15 Comments at 15. Similarly, the best-performing quartile of poultry facilities discharges total nitrogen at levels over 16 times lower than the applicable ELG allows. *Id.*

93.     In addition, DMR data show that many MPP facilities that discharge over 250,000 gallons of wastewater per day currently achieve levels of pollution well

below existing regulatory limitations. For example, more than half of these facilities report discharging less than *one third* of the applicable total nitrogen ELG monthly limit. *See* Env't Integrity Project, Water Pollution from Slaughterhouses (2018), https://environmentalintegrity.org/wp-content/uploads/2018/10/Slaughterhouse_ Report_Final.pdf.

94.     In 2020, according to DMR data, the monthly average total nitrogen concentration discharged by the best-performing poultry facility was as low as 0.8 mg/L and never exceeded 3.3 mg/L. *See* Env't Integrity Project, 2020 DMR Total Nitrogen Analysis for Large Slaughterhouses (2021). By contrast, the applicable ELG allows poultry facilities to discharge a total nitrogen monthly average of 103 mg/L, over 30 times above the best-performing facility's highest monthly average. *See* 40 C.F.R. § 432.113.

95.     Information about the existence of modern, affordable pollution technology already in use at MPP facilities, POTWs, and other industrial sites is readily available to EPA. Indeed, EPA has been aware of one such technology, Biological Nutrient Removal, for over 20 years.

**Pretreatment Standards**

96.     Since at least 1977, EPA has repeatedly acknowledged that pollutants in MPP facility wastewater are incompatible with many POTWs.

97.     Indeed, EPA has long required other industrial sources of these pollutants to comply with pretreatment standards. *See, e.g.*, Nonferrous Metals Manufacturing Point Source Category; Effluent Limitations Guidelines,

28

Pretreatment Standards, and New Source Performance Standards, 49 Fed. Reg. 8,742, 8,766 (Mar. 8, 1984) ("It is necessary to promulgate [pretreatment standards] to prevent pass-through . . . of lead, zinc, fluoride, and ammonia.").

98.    In 2021, EPA acknowledged that "[d]ata indicate that MPP facilities are causing problems for POTWs that receive MPP wastewater via indirect discharges." *See* Preliminary Plan 15 at 6-2. Indeed, EPA's review of 200 indirect-discharging MPP facilities "show[ed] that 73 [percent] of the POTWs receiving MPP wastewater have violation(s) of permit limits for pollutants found in MPP wastewater." *Id*. Moreover, most POTWs included in EPA's review were not subject to any nitrogen or phosphorus limits at all, "which indicates that many POTWs may not be removing much of the nutrient load discharged to POTWs from MPP industrial users." *Id*.

99.    EPA can readily access information about indirect-discharging MPP facilities to inform up-to-date pretreatment standards. In fact, as the Agency itself has recognized, "[i]ndirect dischargers [are required to] file compliance monitoring reports with their control authority (e.g., POTW) at least twice a year[.]" 2004 Technical Development Document at 3-16.

## CLAIMS FOR RELIEF

**First Claim for Relief: EPA Has Violated the CWA by Failing to Review and Revise ELGs for the MPP Industry**

100.    The CWA mandates that EPA "shall" revise ELGs for the MPP industry "at least annually," if appropriate. 33 U.S.C. § 1314(b). Thus, the CWA establishes a nondiscretionary duty with respect to ELGs. Every year, EPA must

complete a review of existing ELGs and either: (1) decide that revisions are not appropriate or (2) finalize revisions, if appropriate.

101.    At best, EPA last completed its mandatory review-and-revise duty with respect to the MPP industry ELGs on May 2, 2018, when the Agency published its final decision not to revise MPP industry ELGs.

102.    Since 2018, EPA has repeatedly acknowledged that revisions to MPP industry ELGs are appropriate, but the Agency has not revised the MPP industry ELGs. EPA has neither published proposed revisions, specified a timeline for the revision process, nor expressly declined to undertake revisions in a final agency document. Thus, EPA has not completed the required annual reviews—including the appropriate revisions—for the MPP industry.

103.    As a result, "small" meat slaughterhouses and rendering facilities remain subject to outdated ELGs promulgated in the mid-1970s and, absent more protective state standards, "non-small" meat and poultry slaughterhouses and rendering facilities must adhere only to ELGs that EPA last updated more than 15 years ago. There are no national standards curbing phosphorus water pollution from any MPP facility and no national standards regulating any water pollution from "small" poultry slaughterhouses.

104.    EPA's failure to complete its review-and-revision responsibilities with respect to the MPP industry ELGs constitutes a "failure of the Administrator to perform an[] act or duty under [the CWA] which is not discretionary with the Administrator," within the meaning of 33 U.S.C. § 1365(a)(2).

105.   EPA's conduct makes it less likely that MPP facilities will reduce their pollutant discharges. As a result, Plaintiffs will endure greater-than-necessary levels of pollution in the waters they seek to use and enjoy.

106.   An order from this Court requiring EPA to comply with its statutory obligation under the CWA will ensure that surface waters are not polluted at unnecessarily high levels, thereby redressing Plaintiffs' injuries.

107.   Plaintiffs are entitled to declaratory and injunctive relief ordering EPA to complete its review of the MPP industry ELGs in conformance with the CWA.

**Second Claim for Relief: EPA Violated the APA by Unreasonably Delaying Publication of Pretreatment Standards for the MPP Industry**

108.   The CWA mandates that the EPA "shall" publish "regulations establishing pretreatment standards for introduction of pollutants into [POTWs] for those pollutants which are determined not to be susceptible to treatment by [POTWs] or which would interfere with the operation of [POTWs]." 33 U.S.C. § 1317(b)(1). Additionally, the CWA provides that EPA "shall, from time to time, as control technology, processes, operating methods, or other alternatives change, revise [pretreatment] standards[.]" *Id*. § 1317(b)(2).

109.   Despite EPA's repeated acknowledgment—including as early as 1977—that pollutants contained in MPP facility wastewater require pretreatment, the Agency has *never* promulgated pretreatment standards for MPP facilities.

110.   EPA's failure to publish MPP industry pretreatment standards constitutes "agency action . . . unreasonably delayed." 5 U.S.C. § 706(1).

31

111.    EPA's conduct makes it less likely that pollutant discharges originating from MPP facilities will be reduced. As a result, Plaintiffs will endure greater-than-necessary levels of pollution in the waters they seek to use and enjoy.

112.    An order from this Court requiring EPA to comply with its statutory obligation under the CWA will ensure that surface waters are not polluted at unnecessarily high levels, thereby redressing Plaintiffs' injuries.

113.    Plaintiffs are entitled to declaratory and injunctive relief ordering EPA to publish pretreatment standards for the MPP industry in conformance with the procedures set forth in 33 U.S.C. § 1317(b).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.      Declare that EPA has violated the Clean Water Act by failing to complete its revision of MPP industry ELGs;

2.      Declare that EPA has violated the Administrative Procedure Act by unreasonably delaying its publication of MPP industry pretreatment standards;

3.      Order Defendant Regan to issue revised regulations in accordance with sections 304(b) and 307(b) of the Clean Water Act that apply to the MPP industry;

4.      Retain jurisdiction of this action to ensure compliance with its decree;

5.      Award Plaintiffs the costs of this action, including attorney's fees; and

6.      Grant such other relief as the Court deems just and proper.

Respectfully submitted,


s/ Alexis Andiman
ALEXIS ANDIMAN
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
(212) 854-7376
aandiman@earthjustice.org

TONTY ENMANUEL RUTINEL
*[Pro Hac Vice Application Pending]*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
(917) 410-8673
mrutinel@earthjustice.org


s/ Jennifer Duggan
JENNIFER DUGGAN (D.C. Bar No. 978352)
SARAH KULA (D.C. Bar No. 1720116)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
(202) 263-4446
jduggan@environmentalintegrity.org
skula@environmentalintegrity.org

*Counsel for Plaintiffs*