PRE-PUBLICATION NOTICE

The EPA Administrator, Lee M. Zeldin, signed the following final action on August 28, 2025, and EPA is submitting it for publication in the *Federal Register* (FR). The EPA is providing this document solely for the convenience of interested parties. This document is not disseminated for purposes of EPA's Information Quality Guidelines and does not represent an Agency determination or policy. While we have taken steps to ensure the accuracy of this Internet version of the document, it is not the official version of the document for purposes of compliance or effectiveness. Please refer to the official version in a forthcoming FR publication, which will appear on the Government Printing Office's govinfo website (https://www.govinfo.gov/app/collection/fr) and on Regulations.gov (https://www.regulations.gov) in Docket No. EPA-HQ-OW-2021-0736. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

6560-50-P

## ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Part 432**

**[EPA-HQ-OW-2021-0736; FRL-8885-03-OW]**

**RIN 2040-AG22**

**Clean Water Act Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final action.

**SUMMARY:** The United States Environmental Protection Agency (the EPA or Agency) is withdrawing the proposed rule entitled "Clean Water Act Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category," which published in the *Federal Register* on January 23, 2024. After considering public comments on the proposed rule, the EPA has decided not to finalize revised technology-based effluent limitations guidelines (ELGs) or pretreatment standards for the Meat and Poultry Products (MPP) industry, based on exercise of its statutory discretion and judgment that such revisions would not be appropriate.

**DATES:** As of [**INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER**], the proposed rule published on January 23, 2024, at 89 FR 4474, is withdrawn. In accordance with 40 CFR part 23, this final action shall be considered issued for the purposes of judicial review at 1 p.m. Eastern Standard Time on [**INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER**]. Under section 509(b)(1) of the Clean Water Act (CWA), judicial review of the Administrator's final action regarding effluent limitations guidelines and pretreatment standards

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

can only be done by filing a petition for review in the United States Court of Appeals within 120 days after the decision is considered issued for purposes of judicial review.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA-HQ-OW-2021-0736. All documents in the docket are listed on the *http://www.regulations.gov* web site. Although listed in the index, some information is not publicly available, e.g., confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Steve Whitlock, Engineering and Analysis Division, Office of Water (4303T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington DC 20460; telephone number: 202-566-1541; email address: *Whitlock.Steve@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

*What Other Information Is Available To Support This Final Action?*

The action is supported by several documents, including:

- Development Document for Final Action on the Meat & Poultry Products Point Source Category Effluent Limitations Guidelines and Standards (Development Document), Document No. 821-R-25-001. This report summarizes the technical, engineering, and economic analyses that EPA considered in taking the final action, including cost of regulatory options, adverse non-water quality environmental impacts,

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

effluent reductions and associated benefits, and calculation of the effluent limitations considered.

- Docket Index for Final Action for the Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category. This document provides a list of the additional memoranda, references, and other information the EPA considered in taking final action on the MPP ELGs.

## I. Executive Summary

On January 23, 2024, the EPA proposed to revise the existing technology-based effluent limitations guidelines and standards for the meat and poultry products point source category. The Agency solicited comment on possible revisions and additions to the ELGs for existing and new sources in this category. The EPA took comment on a range of options in the proposed rule. The options included more stringent effluent limitations on total nitrogen, new effluent limitations on total phosphorus, updated effluent limitations for other pollutants, new pretreatment standards for indirect dischargers, and revised production thresholds for some of the subcategories in the existing rule. Additionally, the EPA also considered effluent limitations on chlorides, establishing effluent limitations for *E. coli* for direct dischargers, and including conditional limits for indirect dischargers that discharge to POTWs operating nutrient treatment technologies to remove nutrients. Inherent in the Agency's proposal was the additional option of withdrawing the proposed rule (the no-rule option). The Agency considered the same options in this final action, with updates informed by public input.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

Informed by concerns expressed in public comments received on the proposed rule, the EPA has decided not to finalize revised ELGs or pretreatment standards for the MPP industry. Accordingly, the EPA is withdrawing the proposed rule based on its statutory discretion to determine whether such revision is "appropriate," (CWA section 304(b)) and factors for establishing such requirements, including "such other factors as the Administrator deems appropriate." (CWA section 304(b)(1)(B); 304(b)(2)(B), 304(b)(4)(B)). In the EPA's judgment, it is not appropriate to impose additional regulation on the MPP industry, given Administration priorities and policy concerns, including protecting food supply and mitigating inflationary prices for American consumers following a protracted period of high inflation from 2020 through 2024. The MPP industry is critical to the nation's food supply, and there is a shift in national policy toward ensuring reduction of the cost of living and reinvigorating American industry. In addition, past and ongoing external stressors on this industry require sustained attention, including COVID-19 food supply and supply chain issues, inflationary pressures, highly pathogenic avian flu (HPAI), and the New World Screwworm (NWS). For all of these reasons, the EPA is exercising its statutory discretion to choose how to marshal and prioritize its resources and is not proceeding with revisions to the MPP ELGs or establishing pretreatment standards for this industry, as explained in section VI of this document. In addition, the agency's analysis of regulatory options considered shows that they would negatively impact the environment and public health in the form of increased air pollution and solid waste. This final action avoids these negative impacts because the EPA has chosen the no-rule option.

## II. Public Participation

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

During the 60-day public comment period on the proposed rule (89 FR 4474, January 23, 2024) (from January 23, 2024, to March 25, 2024), the EPA received more than 5,000 public comment submissions from private citizens, industry representatives, technology vendors, government entities, environmental groups, and trade associations. The EPA also hosted three public hearings during the public comment period—an online hearing January 24, 2024, an in-person hearing January 31, 2024, and another online hearing March 20, 2024. These hearings had a combined total of 362 attendees, 46 of whom registered to provide comment on the proposed rule. Available documents and recordings from each public hearing include transcripts of the presentations and a list of attendees (document control number (DCN) MP01489, DCN MP01489A1, MP01489A2, DCN MP02001, DCN MP02001A1, DCN MP02001A2, DCN MP02002, and DCN MP02002A1, DCN MP02002A1).

### III. Background

Over more than 50 years, EPA, states, and local partners have worked collaboratively to implement the CWA and there have been significant reductions in pollution entering our nation's waterways. Under one component of CWA implementation, the EPA is to issue effluent limitations guidelines, pretreatment standards and new source performance standards for industrial dischargers. Before the passage of the Clean Water Act, the nation's surface waters were significantly polluted. The Cuyahoga River became the symbol of polluted waters when it caught fire at least a dozen times prior to the Clean Water Act's passage in 1972. Under the Act, pollution discharges have been significantly reduced and our nation's waterbodies have recovered. Waters that were once contaminated are clean and safe for wildlife and recreation. A

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

key component of this recovery has been reductions in point-source discharges of nutrients, particularly nitrogen and phosphorus, under the Act. While additional reductions in nitrogen and phosphorous loads to certain waters may further improve water quality, the Agency and its partners have generally shifted focus to non-point sources of these pollutants. The most significant sources of nitrogen and phosphorus loads to our nations waters today are non-point sources.

In taking this final action, the EPA considered revisions of the ELGs and promulgation of pretreatment standards for the MPP industry based on Best Practicable Control Technology Currently Available (BPT), Best Conventional Pollutant Control Technology (BCT), Best Available Technology Economically Achievable (BAT), Best Available Demonstrated Control Technology (BADCT) for New Source Performance Standards (NSPS), Pretreatment Standards for Existing Sources (PSES), and Pretreatment Standards for New Sources (PSNS). These types of effluent guidelines and standards are summarized in the preamble for the proposed regulation (89 FR 4474, January 23, 2024).

As part of the EPA ELG review process, the EPA conducted a cross-industry review of publicly available discharge monitoring report (DMR) and toxics release inventory (TRI) data from 2015 on nutrient discharges from industrial point source categories. This review identified industries, based on their discharges of nutrients in wastewater and the potential to reduce their nutrient discharges, that may be candidates for ELG development or revision and prioritized them for further review. As a result of the cross-industry review of nutrients in industrial wastewater and the further review of the MPP category, the EPA began a detailed study of the MPP industry. The goals of the MPP detailed study were to gain a better understanding of the

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

industry and evaluate whether the ELGs should be revised. In 2021, in the Preliminary Effluent Guidelines Program Plan 15 (Preliminary Plan 15), the EPA announced the agency's intent to develop a rulemaking to revise the existing discharge standards for the MPP industry (USEPA. 2021. EPA-821-R-21-003).

On December 23, 2022, Plaintiffs Cape Fear River Watch, Rural Empowerment Association for Community Help, Waterkeepers Chesapeake, Waterkeeper Alliance, Humane Society of the United States, Food & Water Watch, Environment America, Comite Civico del Valle, Center for Biological Diversity, and Animal Legal Defense Fund filed a complaint alleging that the EPA's failure to revise ELGs and to promulgate pretreatment standards for the MPP category constituted failures to act by statutory deadlines in violation of the CWA and Administrative Procedures Act ("APA") (*Cape Fear River Watch et al. v. United States Environmental Protection Agency*, No. 1:22-cv-03809 (D. D.C)).

Although the EPA was in the process of conducting the MPP rulemaking, as announced in its Preliminary Effluent Guidelines Program Plan 15 (86 FR 51155, September 14, 2021), the EPA had not publicly announced any specific timeline for completion. The parties initiated settlement discussions, resulting in a proposed consent decree with deadlines for completion of the rulemaking, which the EPA entered into after public notice and comment (88 FR 12930, March 1, 2023). Under the consent decree, the EPA had obligations to sign a notice of proposed rulemaking by December 13, 2023, which was completed, and to sign a decision taking final action by August 31, 2025 (Consent Decree, *Cape Fear River Watch et al. v. EPA*, Case No. 1:22-cv-03809-BAH (05/03/23)). Through this action withdrawing the proposed rule, the EPA is fulfilling its consent decree obligation to take final action with respect to this rulemaking.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

## IV. Meat and Poultry Products Industry Description

The MPP point source category includes facilities "engaged in the slaughtering, dressing and packing of meat and poultry products for human consumption and/or animal food and feeds. Meat and poultry products for human consumption include meat and poultry from cattle, hogs, sheep, chickens, turkeys, ducks and other fowl as well as sausages, luncheon meats and cured, smoked or canned or other prepared meat and poultry products from purchased carcasses and other materials. Meat and poultry products for animal food and feeds include animal oils, meat meal and facilities that render grease and tallow from animal fat, bones and meat scraps" (40 CFR 432.1). For more information on how facilities were classified, see the *Meat and Poultry Products (MPP) Facility Characterization Data Memorandum* (USEPA. 2025. DCN MP01447). For number of facilities by process and discharge type, see the *Development Document for Final Action on the Meat and Poultry Point Source Category* (DCN MP02006), Section 2.

The EPA evaluated technologies available to control and treat wastewater generated by the MPP industry. The EPA has not identified any practical difference in types of treatment technologies between meat products and poultry products facilities. Some MPP processes result in wastewater streams with higher concentrations of pollutants, but facilities across the industry generally contain the same pollutants, including nitrogen, phosphorus, oil & grease, biochemical oxygen demand (BOD), total suspended solids (TSS), and chlorides. See the Development Document (DCN MP02006) and the proposed rule, Clean Water Act Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category proposed rule (89 FR 4474, January 23, 2024) for more information on control and treatment technologies.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

## V. Data Collection After Proposal and Comment Responses

Following the publication of the MPP proposed rule, the EPA received additional data from industry and assessed comments from stakeholders on the proposal. This additional information resulted in updates to the methodologies the EPA used in the engineering, economic, and environmental assessments.

*A. Survey Follow-up and New Analytical Data*

- Survey: Following proposal, the EPA continued to conduct follow up with individual respondents to coordinate corrections to responses or obtain missing responses. The EPA also followed up with some facilities to clarify and further support financial information. The MPP Questionnaires were taken offline on April 1, 2024, and the EPA used this as the complete questionnaire dataset with 2,261 responses received from eligible facilities. The EPA also conducted additional and more complex analyses using the questionnaire data.

- Site Visits: The EPA visited two additional rendering facilities and discussed issues specific to renderers. To confirm and support their comments, industry provided the EPA with additional data for renderers, specifically regarding boiler condensate and high levels of BOD. Industry also discussed land availability for facilities in urban areas.

- Meetings with Industry: The EPA met with industry to discuss the status of the rulemaking and to get clarification on industry concerns expressed in their public comments on EPA estimated compliance costs, pretreatment standards for indirect discharging facilities, and chlorides removal technology. The EPA requested the industry

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

representatives provide the EPA with specific costing information to support their concerns. The EPA also met with GELITA USA, a gelatin, collagen, and peptide manufacturer, and discussed the differences in rendering operations and gelatin operations as a follow-up to their comments on the proposal. The EPA also met with several representatives from industry to discuss their comments on chlorides treatment.

*B. Comment Response*

The EPA received 4,369 mass mail public comments and posted 810 comments to Federal Docket Management System, resulting in 611 unique comments on the proposed rulemaking. The EPA considered the comments, revised existing analysis and conducted updated analyses. For example, comments and data on rendering wastewater led the EPA to make adjustments to the engineering and economic analyses. Comments on land availability led to additional analysis on availability and costs. Full response to comments can be found in *Response to Public Comments on Proposed Effluent Limitations Guidelines and Standards for the Meat and Poultry Products Point Source Category* (DCN MP01459).

## VI.  Basis for Final Action

*A. Rationale for Withdrawing the Proposed Rule*

Informed by concerns expressed in public comments received on the proposed rule, the EPA has decided not to finalize revised ELGs or pretreatment standards for the MPP industry, based on exercise of its statutory discretion and judgment that such regulations would not be appropriate, for the reasons discussed below.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

Under the Clean Water Act, the EPA has broad discretion to consider the factors described here in this section in determining whether to revise existing effluent guidelines. Unlike the mandatory requirement to promulgate ELGs reflecting Best Available Technology Economically Achievable by 1989, the EPA is required to revise such ELGs only "if appropriate." *See* CWA section 304(b) (EPA "shall…publish…regulations, providing guidelines for effluent limitations, and, at least annually thereafter, *revise*, *if appropriate*, such regulations.") (emphasis added). The term "if appropriate" is not further defined in the statute, giving the EPA broad discretionary authority to assess whether revision is "appropriate" in light of Administration policies, priorities, and other factors. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("One does not need to open a dictionary in order to realize the capaciousness of this phrase. In particular, 'appropriate' is the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.") (internal citation omitted).

Here, although the Act requires consideration of certain specified factors when *establishing* new or revised ELGs, the requirement to assess whether revision of these ELGs is "appropriate" is not expressly tied to these factors. *See Our Children's Earth Foundation v. EPA*, 527 F.3d 842, 851 (9th Cir. 2008) (finding that the CWA does not mandate use of a technology-based approach in reviewing ELGs to determine whether revision is appropriate). As the Ninth Circuit found in *Waterkeeper Alliance v. EPA*, the EPA is "not required… to revise an ELG simply because it was out of date or not comprehensive." 140 F.4th 1193, 1215 (9th Cir. 2025). The Court explained that "the decision whether to initiate a rulemaking to revise any given ELG is "discretionary[,] as indicated by the 'if appropriate' language." *Id.* at 1216, citing *Our Children's Earth Foundation*, 527 F.3d at 850-51(9th Cir. 2025). Indeed, the Court

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

specifically held that "it was within the EPA's discretion to prioritize the revision of certain ELGs over others by…seek[ing] to identify where revision will do the most good" (*Id.* at 1215) and that " the EPA "has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities" *Id.* at 1216 (internal citation omitted). Based on this statutory discretion, the *Waterkeeper* court "reject[ed] Petitioners' apparent assumption…that EPA acted in a manner that was arbitrary and capricious simply because EPA had evidence certain ELGs are out of date but declined to act." *Id*. at 1216-17. *Cf.  American Iron and Steel Inst. v. OSHA*, 182 F.3d 1261, 1268-9 (11th Cir. 1999) ("Logic dictates that an agency must have some discretion in setting an agenda for rulemaking and excluding some matters categorically.  Otherwise rulemaking would be very difficult because an agency would be unable to concentrate its scarce resource on a particular problem"); *Sierra Club v. EPA*, 828 F.2d 783, 797 (D.C. Cir. 1987) ("Because 'a court is in general ill-suited to review the order in which an agency conducts its business,' we are properly hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus to give it precedence over others" (internal citation omitted);  *American Horse Protection Assn. v. USDA*, 812 F.2d 1 (D.C. Cir. 1986) ("Review under the 'arbitrary and capricious' tag line… encompasses a range of levels of deference to the agency…. [A]n agency's refusal to initiate rulemaking proceedings is at the high end of that range… Such a refusal is to be overturned only in the rarest and most compelling of circumstances." (internal citation omitted).

Accordingly, the EPA has broad discretion to consider the Administration's priorities and policy concerns discussed here in this section in determining whether it is "appropriate" to revise

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

an ELG – and is not specifically constrained by the statutory factors that any such revised ELG must meet.

Even if the EPA's decision as to whether it is "appropriate" to revise an ELG is constrained by the statutory factors for establishing ELGs, those statutory factors expressly include "such other factors as the Administrator deems appropriate." *See* CWA section 304(b)(2)(B); 304(b)(1)(B); and 304(b)(4)(B) (authorizing consideration of "such other factors as the Administrator deems appropriate" in assessing Best Available Technology (BAT), Best Practicable Control Technology (BPT), and Best Conventional Pollutant Control Technology (BCT), respectively). That the term "appropriate" is used repeatedly, first in the statutory requirement to identify candidates for revision, and again, in the statutory provisions governing the establishment of new or revised standards, underscores the EPA's broad statutory discretion to prioritize ELGs for revision. Accordingly, the EPA considered the Administration's priorities and policy concerns discussed here in this section, in addition to the specified statutory factors, in deciding not to revise the ELGs and pretreatment standards for this industry. *See Weyerhaeuser v. Costle*, 590 F.2d 1011, 1045 (D.C. Cir. 1978) (Congress intended that the EPA have discretion ''to decide how to account for the consideration factors, and how much weight to give each factor'').

Based on these statutory authorities, the EPA has decided that it is not appropriate to finalize the proposed rule considering the Administration's priorities and policy concerns including protecting the food supply, mitigating inflationary pressures on food pricing for American consumers, and reinvigorating American industry.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

At the core of the EPA's decision is the understanding that the MPP industry plays a critical role in the nation's food supply chain, and meat and poultry processors have faced an unprecedented disruption in operations and costs in recent years as a result of several factors, including COVID-19 food supply and supply chain issues, inflationary pressures, and the unprecedented outbreak of avian flu and New World Screwworm, as discussed below. Establishing more stringent ELGs and pretreatment standards for the MPP industry would result in further diversion of the industry's resources at a critical time, potentially reducing the number of MPP facilities due to the cumulative impacts of multiple economic stressors on the industry, thus further reducing the competitiveness of this industry. The closure or reduced capacity of MPP facilities, even if within the range of impacts typically considered to be economically achievable, could have significant impacts on the nation's food supply and pricing, as was evidenced during the COVID-19 national emergency. Additional regulation may also divert the industry's attention from focusing on measures to diversify, increase production and thus food availability and affordability, and combating avian flu and NWS, all of which are crucial to protecting the nation's food supply, mitigating higher prices and reducing the cost of living for the American public.

Recent Presidential memoranda, Executive Orders, and actions taken by the U.S. Department of Agriculture (USDA) reflect the Administration's priorities and policy concerns that have implications for the MPP industry. On January 20, 2025, President Trump issued a memorandum titled, "Delivering Emergency Price Relief for American Families and Defeating the Cost-of-Living Crisis." This memorandum highlights inflationary pressures that have affected industrial production and food prices in recent years and calls for action to reduce cost-

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

of-living through deregulatory actions. As context, from 2020 through 2024, American consumers weathered significant impacts from inflationary pressures. According to USDA, U.S. food prices rose by 23.6% from 2020 to 2024, outpacing the overall consumer price index increase of 21.2% (DCN MP02048). Additionally, data from the U.S. Bureau of Labor Statistics indicate that as of March 2025 the 12-month increase in national food prices (3%) continued to outpace the 12-month increase in aggregate Consumer Price Index (2.4%). This increase follows a period of significant food price inflation, with the rate peaking at 11.4% in 2022.

The importance of ensuring food availability and affordability is a longstanding and durable goal of American policy. For example, the Food Security Act of 1985 included provisions to ensure that consumers had access to an abundant and affordable food supply. The Act highlighted the role of agriculture price support programs and their impacts to consumer costs for food and fiber. The Act addressed (i.e., moderated) crop price support levels to support the affordability and availability of feed grains for livestock and thereby ensure affordable meat prices. Underpinning the importance of safe abundant, affordable food supply, Congress takes up a new farm bill every five years. Further, during the COVID-19 national emergency President Trump signed Executive Order 13917, titled *Delegating Authority Under the Defense Production Act with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19*, April 28, 2020  (85 FR 26313; May 1, 2020) This order utilized authority under the Defense Production Act to support ongoing operation of meat and poultry processing facilities at that time. This order cited that "any unnecessary closures can quickly have a large effect on the food supply chain. For example, closure of a single large beef processing facility can result in the loss of over 10 million individual servings of beef in a single

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

day. Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain." The tenet of this executive order—that the operation of meat and poultry processing facilities is essential to the secure domestic food supply chain—remains true.

Accordingly, the EPA examined the potential food price and availability impacts of establishing more stringent ELGs for the MPP industry. The EPA found that the closure or reduced capacity of MPP facilities resulting from such regulation could have significant impacts on food prices and availability. As evidenced by the COVID-19 national emergency, closures and reduced capacity of MPP facilities disrupted the availability of food and created short- and long-term price impacts. *See* MPP Proposed Rule, 89 FR 4474, 4492 (January 23, 2024) ("our overreliance on just a handful of giant processors leaves us all vulnerable, with any disruptions at these bottlenecks rippling through our food system"). In addition, the Agency's analysis of regulatory options for this final action shows that the no-rule option will prevent between $1.1 to $7.8 billion in capital costs and prevent $315 million to $1.3 billion in annual operation and maintenance costs associated with compliance (*See* Table 7-12 of Development Document, DCNMP02006). Given that demand for MPP products is relatively inelastic to price changes (i.e., demand for MPP products holds steady even when prices increase), it is reasonable to assume that a portion of these costs would be paid by American families in the form of increased food prices.

Public comments further support the EPA's findings regarding potential impacts of MPP facility closures and reduced capacity on food price and availability. Several public comments described how COVID-19 resulted in temporary backlogs of meat processing, which led to meat

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

shortages at grocery stores, and higher prices for the meat that was available. Commenters stated that the COVID-19 national emergency revealed how consolidation in the industry can negatively impact food supply and pricing – and conversely, the importance of diversification in the industry to help protect against such impacts. As one commenter noted, "[s]mall and midsize meat processors are essential to economic success of multiple sectors of our overall economy. When we risk losing any processor, we risk detrimental economical outcomes." (Kentucky Ass'n of Meat Processors, Comment EPA-HQ-OW-2021-0736-0846-A1). Facility closures that would result from the proposed regulations would reduce diversification in the industry, potentially resulting in the food price increases evidenced by the COVID-19 national emergency.

Additionally, on January 20, 2025, President Trump issued a memorandum titled, "America First Trade Policy." This memorandum called for action to help and not hinder the competitiveness of American industry, which is relevant to the Meat and Poultry Industry that faces trade competition with foreign producers, including in Mexico, Australia, and Canada (DCN MP01465). Further, on January 31, 2025, President Trump issued Executive Order 14192, Unleashing Prosperity Through Deregulation (90 FR 9065; February 6, 2025). This order states, "It is the policy of my Administration to significantly reduce the private expenditures required to comply with Federal regulations to secure America's economic prosperity and national security and the highest possible quality of life for each citizen."

In light of these priorities and policy concerns, the EPA considered the potential impacts of revised ELGs and pretreatment standards on compliance costs and competitiveness of the MPP industry in a global marketplace. The EPA's analysis of regulatory options for this final action shows that the no-rule option avoids the closure of between 10 and 93 facilities in the

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

MPP industry (see table 14-1 of the Development Document, DCNMP02006). These closures would be associated with the short-term loss of 3,199 to 26,657 American jobs (see table 16-2 of the Development Document, DCNMP02006).

Public comments echoed the EPA's concerns regarding impacts on the competitiveness of the MPP industry. *See* Kentucky Association of Meat Processors, Comment EPA-HQ-OW-2021-0736-0846-A1 ("Causing the closure of multiple MPP's would hurt competition and our economy."); Michigan Farm Bureau, Comment EPA-HQ-OW-2021-0736-0697-A1("Meat and poultry processors, especially small and medium sized processors, already struggle with high regulatory costs and steep price competition from foreign sources who may not face the same regulations and costs we incur to protect the environment, worker safety, and public health."). One commenter also noted that 85% of the beef industry is controlled by four big meat packers, two of which are foreign-owned – and expressed concern that the closure of smaller, locally owned businesses as a result of increased regulatory compliance costs "means more of our hard-earned money will leave our local economies and will be funneled into countries other than our own." Comment EPA-HQ-OW-2021-0736-1449. Several commenters indicated that inflation is elevated especially for the food industry and is likely to impact consumers. *See, e.g.,* Public Comment EPA-HQ-OW-2021-0736-0712-A1(Iowa Farm Bureau): (the proposed rule "may limit the availability of meat to consumers during a time of significant inflationary pressures"); Public Comment EPA-HQ-OW-2021-0736-0846-A1(Kentucky Association of Meat Processors) ("In a time of record inflation, consumers cannot afford these costs. Meat prices already outpace other commodities in increasing inflation."); Public Comment EPA-HQ-OW-2021-0736-0870-A1(Office of the Attorney General of Kansas et al.) ("Federal statistics show that inflation,

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

especially for meat and poultry, remains elevated."). The EPA agrees that additional regulation on the MPP industry would only exacerbate the inflationary pressures that are already causing high food prices for the American public.

Further, in March 2020, an outbreak of avian flu (HPAI) first occurred at a commercial turkey facility in the United States, and over the five years since then at least 1,400 outbreaks have occurred in more than 600 counties nationwide, leading to the death of some 135 million birds (DCN MP01465, DCN MP01477). Though largely affecting egg laying hens, the outbreak has also impacted broiler production and has had a pronounced effect on turkey production with 14.3 million turkeys affected since 2022 (DCN MP01490). While avian flu has been a threat in the past, this outbreak has affected more species than in past outbreaks (DCN MP01492). Thus, avian flu constitutes an ongoing economic stressor on the industry, as MPP facilities spend time, attention and resources on addressing the outbreak. Additional regulation would add to the cumulative economic impacts on this industry, potentially resulting in more closures and production slowdowns that would impact the nation's food supply and food costs while diverting industry's attention from focusing on an ongoing threat that requires continued vigilance on the part of the industry.

The New World Screwworm (NWS) also presents a threat to the meat and poultry sector. Once a pervasive problem for the U.S. livestock sector, the NWS was eliminated from North and Central America through a multinational effort led by the USDA in the 1960s. The value of this eradication campaign to the U.S. cattle industry has been estimated as approximately $2.3 billion per year (DCN MP02205). However, in 2022 the NWS reappeared in Panama, has since spread northward to Mexico, and is now considered to pose a serious threat to U.S. livestock producers.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

The NWS is particularly dangerous for the meat and poultry sector where many animals are raised in close confinement where the parasite can spread quickly. In June of this year, in an attempt to combat the further spread of the NWS, the U.S. Secretary of Agriculture announced the opening of an $8.5 million sterile NWS fly dispersal facility in South Texas, and on July 9, 2025, ordered the closure of livestock trade through all southern ports of entry to prevent the spread of the parasite into the country (DCN MP02206). Like avian flu, the NWS creates economic stress and uncertainty that could potentially impact food supply, prices, and the competitiveness of the MPP industry.

Based on the cumulative consideration of Administration priorities, policy concerns, and these factors in exercise of the Agency's statutory authority, the EPA has determined that it is not appropriate to impose additional regulation on this industry. The MPP industry is critical to the nation's food supply, there is a shift in national policy toward reducing cost of living and reinvigorating American industry, and past and ongoing external stressors on this industry are requiring sustained attention—COVID-19 food supply and supply chain issues, inflationary pressures, avian flu, and NWS. In addition, the EPA found that such regulation would result in adverse non-water-quality environmental impacts, a required factor for consideration in the statute. *See* CWA 304(b)(1)(B); 304(b)(2)(B); 304(b)(4)(B). Specifically, EPA's analysis shows that the regulatory options considered would increase energy consumption thereby increasing ozone and fine particulate air pollution, causing between $24 million and $359 million in adverse human health impacts (see table 9-9 of the Development Document DCNMP02006). The regulatory options considered would also result in between 2.5 billion to more than 8.4 billion pounds of solid waste, which would be sent to landfills or land-applied. Studies have linked land-

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

application of these solid wastes—including animal blood, bodily fluids, pathogens, and excrement—to negative environmental, human health, and economic impacts. Properties surrounding the land-application sites can be impacted due to contaminants percolating into groundwater and being transported via groundwater and runoff to other areas. Degraded surface water conditions resulting from these contaminants can negatively affect aquatic life, including by inducing fish kills. In humans, exposure in high enough concentrations has been linked to a range of negative impacts, from gastrointestinal issues to respiratory issues, cancers, and death. *See* Development Document, section 9 (DCNMP02006). Because the EPA has chosen the no-rule option, this final action avoids both the costs associated with regulatory compliance and the significant negative impacts from increased air pollution and solid waste.

Therefore, the EPA is exercising its statutory discretion to choose how to marshal its resources and is not proceeding with revisions to the MPP ELGs or establishing pretreatment standards for this industry. Exercising its statutory discretion to not finalize ELGs or pretreatment standards for this sector is consistent with the Administration priorities expressed by the Presidential memoranda and Executive Orders described above.

*B. Options Considered*

For this final action, the EPA evaluated three regulatory options that were included in the proposed rule. For a description of these options, *see* preamble to the proposed regulation. (89 FR 4474, January 23, 2024). In evaluating these options, the EPA considered the statutory factors for the specified levels of control technology for ELGs and pretreatment standards: BPT, BCT, BAT, NSPS, PSES, and PSNS. The analyses used to support evaluation of these factors were updated after the proposal to incorporate new data, as well as feedback received during the

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

public comment period. Those updated analyses can be found in the Development Document

(DCN MP02006), including the EPA's analysis on technological availability (section 7.2);

cost/economic achievability (sections 13 through15); effluent reduction benefits (section 23);

non-water-quality environmental impacts (section 9); and passthrough/interference (section 5.2).

   The agency also evaluated a no-rule option that was represented by baseline conditions in

the proposed rule and its analyses of the sector in that action. This option was inherent in the

Agency's proposal, and apparent in the terminology used in the proposed rule. Specifically, the

EPA's proposal indicated that the Agency was seeking comments on "possible" (defined as

something that may or may not occur) revisions to the existing ELGs. *See "Possible*," Merriam-

Webster, *https://www.merriam-webster.com/dictionary/possible* (last visited June 16, 2025). The

availability of this option to withdraw the proposed rule was further evidenced by public

comments requesting that the Agency not issue revisions and instead retain the existing ELGs for

the MPP source category. Additionally, the EPA solicited comment not only on the proposed

options, but "any other permutation of these options" (89 FR 4489, January 23, 2024) and "all

aspects of this proposal." *Id.* at 4488.

   After full consideration of the statutory factors, the EPA decided not to finalize revised

ELGs or pretreatment standards for the MPP industry. The EPA found that it was not appropriate

to finalize Option 1, the preferred option at proposal, because the increased regulatory

compliance costs could impact food supply, food prices, and the competitiveness of the MPP

industry and was thus incompatible with Administration priorities and policy concerns, as

discussed above. The other two proposed options would have expanded on Option 1 by including

more stringent requirements that would be applied to more MPP facilities, thus making these

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

options more incompatible than Option 1 with Administration priorities and policy concerns. The

EPA's decision to withdraw the proposed rule was further supported by the non-water-quality

environmental impacts associated with all of the proposed options (*See* Development Document,

section 9. DCN MP02006). Accordingly, after considering the statutory factors with respect to

each of the proposed options, the EPA is exercising its statutory discretion to take final action

withdrawing the proposed rule.

This document is a prepublication version, signed by Administrator Lee M. Zeldin on August 28, 2025. EPA is submitting it for publication in the *Federal Register*. We have taken steps to ensure the accuracy of this version, but it is not the official version. Once the official version of this document is published in the FR, this version will be removed from the Internet and replaced with a link to the official version.

**List of Subjects in 40 CFR Part 432**

Environmental protection; Meat and meat products; Poultry and poultry products; Waste

treatment and disposal; Water pollution control.

 **Lee Zeldin,**

*Administrator.*